**In re Douglas Bruce COOK, Pamela Ann Cook, Debtors.**

**Bankruptcy No. 87–02905–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Feb. 6, 1990.

David E. Kumpe, Pray, Walker, Jackman, Williamson & Marlar, Tulsa, Okl.,

---

Thomas M. Klenda, Tulsa, Okl., for debtors.

## ORDER GRANTING MOTION TO DISMISS

MICKEY DAN WILSON, Bankruptcy Judge.

On October 18, 1987 Douglas Bruce Cook and Pamela Ann Cook ("the Debtors") filed their joint petition seeking relief under Chapter 7 of Title 11. At the time of the filing of this case the Debtors also filed their Schedule of Income and Expenses, Statement of Affairs, Bankruptcy Schedules, Statement of Intention as to Reaffirmation of Contracts and Statement of Executory Contracts and the Attorney's Affidavit. Thereafter on September 8, 1988 the Assistant United States Trustee filed its motion to dismiss this case under 11 U.S.C. § 707(b). The Debtors then, on October 18, 1988 amended their Schedule of Current Income and Expenses and on November 3, 1988 responds to the motion to dismiss of the Trustee with brief in support. On November 3, 1988 the Court, at hearing, took evidence of witnesses sworn and examined and exhibits properly introduced into evidence. The evidence presented shows that the Debtors moved to Tulsa in June of 1987 at which time they purchased a home for $159,000 and executed a note and mortgage in the sum of $154,000 to William E. Schultz, the note calling for monthly payments of interest and principal in the sum of $1,200. This home was the residence of the Debtors and exemption was sought concerning the same. The Statement of Intention of the Debtors shows that the Debtors intended to reaffirm this indebtedness and retain the property but in fact the creditor filed a motion for abandonment and the Debtors did not object and the property was abandoned on January 21, 1988 effectively removing this property as property of the estate and modifying the automatic stay accordingly. No reaffirmation agreement was filed.

Debtor is in the insurance business selling insurance as an agent and has a yearly salary of $75,000 which, after deductions, equates to a monthly salary (net) of $4,779 or $57,348 per year. Debtor is presently earning $100,000 per year. The home involved had both electrical and air conditioning problems causing the electric bill to be exorbitant.[1] Debtors originally listed as their monthly expenses an amount of $7,305.40 which equates to a necessary living expense of $87,660 per year. After the filing of this motion to dismiss the Debtors amended the Schedule of Current Income and Expenses (recalculated as of the date of the filing of the petition) to reduce said monthly expenses to $57,658.56 or $4,804.88 per month. A comparison of the two schedules of income and expenses are in order. The Debtors list their net monthly expense, in both instances at $4,779.35. The Debtors originally listed lodging expenses (of $2,406.39). entries on the Schedule of Current Income and Expenses 5 a., 5 b., 5 d. 1, 5 d. 1, 5 d.3, 5 d.5, 5 j.4 and 5 n. and the amendment shows lodging expenses of $2,006.39. The difference is that the Debtors first sought "routine home maintenance expenses" of $350.00 and upon reflection, reduces this amount to $150.00 per month. The electric bill was first estimated at $582.00 a month and thereafter reduced $382.00 a month. The Debtors also list, in the first instance a telephone expenses of $353.00 a month but reduces the same to $153.00 a month on the amendment. In addition, Debtors claimed and continue to claim an amount for food at $750.00 a month and clothing per month of $500.00, reduced to $400.00 on the amendment. Debtors also seek reasonable cleaning bills of $1,440.00 a year or $120.00 per month on both schedules. It is noteworthy that medical insurance is deducted from Debtor's salary yet Debtors claim $250.00 for additional monthly medical expenses. Debtors also seek approval of transportation expenses (not including auto payments) of, in the first instance $500.00, and thereafter reduced the same to $400.00. Debtors also first sought recreation reasonable expenses of $200.00 a

---

1. Debtors have since the filing of the petition, removed themselves from the home and are now renting a house for a rental of $800 a month.

month but reduces the same to $100.00 a month on said amendment. Debtors also seek the approval of "dependent support" in the sum of $372.66 per month which represents the costs of schooling of an emancipated daughter at the University of Oklahoma. Debtors first sought auto installment payments of $696.00 per month but deletes that amount from its amendment. In addition, Debtors sought "other installment payments of $731.00" which said "other monthly installment" was deleted from the amendment. As mentioned in the first report of Schedule of Current Income and Expenses, the debtors had "necessary expenses in excess of his income of $2,526.00 per month. Thus the Debtors' lifestyle, after bankruptcy, contemplated a loss of about $30,000 per year on a salary which netted the Debtor $57,348 per year. One can readily deduce Debtors seek "necessary" living expenses of $87,348 per year. After amendment the Debtors have reduced their "necessary" expenses to $4,804 per month or $57,658 per year wherein, on the same income the Debtors "only" exceed his take-home pay of $57,348 in an amount of $306.36. Thus it cost these Debtors $57,658 to live according to amendments filed. This is ludicrous.

Debtors' schedules show taxes owed of $159.00 and three secured creditors, representing a mortgage on the homestead and two creditors secured by the three vehicles of the Debtors, all of which are consumer debts. Testimony elicited at time of trial shows the Debtors owe one unsecured creditor, Noble Affiliates, in the sum of $26,776, which may be a business debt and nine other unsecured creditors which are consumer debts in the sum of $50,564. Debtors owe to creditors holding unsecured claims without priority, $77,340. The Court concludes the debts owed are primarily consumer debts. It is noteworthy that the Debtors' reference to the case of *Kelly v. Solot, Zolog and Tucson Realty and Trust Company*, 15 B.C.D. 572, 70 B.R. 109 (BAP. 9 Cir.1986) is improper. The 9th Circuit Bankruptcy Appellate Panel decision was reversed and remanded by the 9th Circuit United States Court of Appeals on March 2, 1988. Reported at 841 F.2d 908, this Court of Appeals decision, in reversing the BAP, stated:

■  2. While secured debt is not automatically excluded from consumer debt it is not automatically included either. We must look to the purpose of the debt in determining whether it falls within the statutory definition. Of the Kellys' mortgage debts, $95,000 consists of a lien they assumed in purchasing their home and $32,000 represents a home equity line of credit incurred for home improvements and the repayment of credit card debts. ER at 102; CR 18 at 38–43. All these fit comfortably within the Code's definition of consumer debt. *[footnote omitted]* It is difficult to conceive of any expenditure that serves a "family ... or household purpose" more directly than does the purchase of a home and the making of improvements thereon.

Other courts are in accord: See *In re Walton*, 69 B.R. 150 (E.D.Mo.1986); *In re Bell*, 65 B.R. 575 (Bkrcy E.D.Mich.1986); *In re Booth*, 18 B.C.D. 863, 858 F.2d 1051 (5th Cir.1988); *In re Wegner*, 91 B.R. 854 (Bkrcy D.Minn 1988).

The Court must be cognizant of the intent and purpose of Chapter 7 of the Bankruptcy Code. The "fresh start" doctrine first appeared in the Bankruptcy Act of 1841 by allowing discharge of indebtedness *with* the consent of the creditors being discharged [2] and that concept was further expanded in the Bankruptcy Act of 1867 which provided a discharge of indebtedness *without* creditor consent. The Bankruptcy Act of 1898 further expanded debtor relief and caused Professor J. Machachlan to comment "the development of the discharge represents an independent ... public policy in favor of extricating an insolvent debtor from what would otherwise be a financial impasse." J. Machachlan, Bankruptcy. Justice Sutherland further elucidated on this doctrine in the now famous case of *Local Loan Co. v. Hunt*, 292 U.S.

---

**2.** See 5 Bankruptcy Developments Journal 361, The Origin of Voluntary Bankruptcy by John C. McCoid II; and Bankruptcy in United States History by Charles Warren (1935).

234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) when he stated at page 244, 54 S.Ct. at page 699:

> ... It is important to bear in mind that the present case is one not within the jurisdiction of a state court, but is a dependent suit brought to vindicate decrees of a federal court of bankruptcy entered in the exercise of a jurisdiction essentially federal and exclusive in character....

> ... primary purposes of the bankruptcy act is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. U.S. Fidelity & G. Co.,* 236 U.S. 549, 554–555 [35 S.Ct. 289, 290, 59 L.Ed. 713]. This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns *at time of bankruptcy,* a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. *Stellwagen v. Clum,* 245 U.S. 605, 617 [38 S.Ct. 215, 218, 62 L.Ed. 507]; *Hanover National Bank v. Moyses,* [186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113], *supra; Swarts v. Fourth National Bank,* 117 Fed. 1, 3; *United States v. Hammond,* 104 Fed. 862, 863; *Barton Bros. v. Texas Produce Co.,* 136 Fed. 355, 357; *Hardie v. Swafford Bros. Dry Goods Co.,* 165 Fed. 588, 591; *Gilbert v. Shouse,* 61 F. (2d) 398. The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act....

> ... The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much as, if not more than, it is a property right.... The new opportunity in life and the clear field for future effort, which it is the purpose of the bankruptcy act to afford the emancipated debtor, would be of little value

> ... we reject the Illinois decisions ... as being destructive of the purpose and spirit of the bankruptcy act.

At the time of the enactment of the Bankruptcy Code, 11 U.S.C. § 707 consisted of permissive authority for the court to dismiss the bankruptcy case only for cause. The "cause" referred to included unreasonable delay by debtor which was prejudicial to the creditors or non-payment of fees or charges required. These subsections are only illustrative of what is meant by "only for cause." Legislative history and conference reports make it clear cause was not intended to be satisfied by the ability of the debtor to repay debts in whole or in part (thus rejecting a mandatory Chapter 13 procedure). Thus, ability to repay debts from future income should not constitute cause, under 11 U.S.C. § 707(a) for dismissal if that be the only ground for dismissal. Section 707(a) was seldom used by creditors. In 1984 subsection (b) of this section was enacted, (and thereafter amended in 1986 to clarify the role of the panel trustee and the U.S. trustee) as follows:

> "(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor."

In many creditors' eyes, this new code had no "moral character" requirement. Chapter 7 relief was offered to any individual for the asking. The code makes no requirement of insolvency or inability to pay debts as those debts matured before individuals sought Chapter 7 relief. Relief for the honest debtor from oppressive and inundating indebtedness, so as to allow the debtor to start afresh, and relief to a debtor to allow a new opportunity in life so as the debtor would not be subject to economic servitude the rest of his life, and relief to a debtor so some light may be exposed

through a long tunnel of indebtedness, have always been lofty goals of bankruptcy acts, and are certainly goals of the bankruptcy code, even though 11 U.S.C. § 109(b) makes no mention of insolvency or inability to pay ones debts as they mature. As we know the term "head start" became in vogue in lieu of "fresh start."

In sum, the debts owed are overwhelmingly consumer debts; the debtors have a likelihood of sufficient future income to fund a Chapter 13 plan which would pay considerable sums of money to the unsecured creditors; the debtors suffered no unforeseen calamity causing their financial difficulty; the debtors have disregarded their duty to accurately disclose their general financial position to the Court; and debtors have substantially overstated their monthly expenses which misrepresents their financial picture and the monthly expenses are unreasonable; the same which constitutes a substantial abuse of Chapter 7 of the bankruptcy code and the Motion to Dismiss should be and is hereby granted.

AND IT IS SO ORDERED.